1
2
3
4
5
6
7
8
9
10

UNITED STATES DISTRICT COURT

CENTRAL DISTRICT OF CALIFORNIA

11
12
13
14
15
16

ANDRE BUTLER,

              Petitioner,

    v.

R. GROUNDS, Warden,

              Respondent.

) Case No. CV 13-1120 JC
)
)
)
) MEMORANDUM OPINION AND
) ORDER DENYING PETITION FOR
) WRIT OF HABEAS CORPUS AND
) DISMISSING ACTION WITH
) PREJUDICE
)
)
)

17
18

**I.    SUMMARY**

19        On February 15, 2013, Andre Butler ("petitioner"), a state prisoner who was

20 then proceeding *pro se*, filed an unverified Petition for Writ of Habeas Corpus by

21 a Person in State Custody ("Petition") pursuant to 28 U.S.C. § 2254, with an

22 attached memorandum ("Petition Memo")[1] and exhibits ("Petition Ex.").

23 ///
24 ///
25 ///

26
27
28

---

[1]As the pages of the Petition Memo are not consecutively numbered after page 22, this Court, for ease of reference, has consecutively numbered the remaining pages thereof commencing with page 23.

1    On July 19, 2013, respondent filed an Answer and a supporting

2  memorandum ("Answer").[2]  On August 21, 2013, the Court appointed counsel for

3  petitioner.  On June 30, 2014, petitioner's counsel filed a Traverse and petitioner's

4  verification of the Petition.

5    The parties have consented to proceed before the undersigned United States

6  Magistrate Judge.

7    For the reasons stated below, the Petition is denied, and this action is

8  dismissed with prejudice.

9  **II.    PROCEDURAL HISTORY**

10   On June 3, 2010, the Los Angeles County District Attorney filed an

11  Amended Information charging petitioner with two violations of California Penal

12  Code section 451(d) – arson of the property of CalTrans (count 2) and arson of the

13  property of Neuman Habana (count 3).  (CT 262-65).  On June 18, 2010, a Los

14  Angeles County Superior Court jury found petitioner guilty of both counts (which

15  were renumbered as counts 1 and 2 on the verdict forms to avoid jury confusion).

16  (CT 292-93).  On the same date, the trial court sentenced petitioner to a total of

17  nine years in state prison.  (CT 308-09; RT 2170-71).

18   On December 7, 2011, the California Court of Appeal affirmed the

19  judgment in a reasoned decision.  (Lodged Doc. 6).  On March 14, 2012, the

20  California Supreme Court denied review without comment.  (Lodged Doc. 8).

21   Meanwhile, on May 6, 2011, petitioner petitioned the Los Angeles County

22  Superior Court for habeas relief.  (Petition Ex. A).  On May 27, 2011, the Superior

23  Court denied the petition for lack of jurisdiction in light of the then pendency of

24  the direct appeal in the Court of Appeal.  (Petition Ex. A).  On June 24, 2011,

25  petitioner petitioned for habeas relief with the California Court of Appeal.

26

27

28   [2]Respondent concurrently lodged multiple documents ("Lodged Doc."), including the
Clerk's Transcript ("CT") and the Reporter's Transcript ("RT").

1    (Lodged Doc. 9).  On June 28, 2011, the Court of Appeal summarily denied such
2    petition without comment.  (Lodged Doc. 10).  On August 18, 2011, petitioner
3    petitioned for habeas relief with the California Supreme Court.  (Lodged Doc. 11).
4    On January 4, 2012, the California Supreme Court summarily denied such petition
5    without comment.  (Lodged Doc. 12).

6    **III.   FACTS**[3]

7        **A.    Prosecution Case**

8            **1.    The Fire**

9            On January 11, 2009, Neuman Habana returned from county jail after
10   serving time for violating his drug program.  Habana lived in a homeless camp
11   next to a freeway off-ramp.  The homeless camp included makeshift shelters with
12   other homeless people living in the area, including petitioner.  When Habana
13   returned to the camp, he noticed petitioner was staying at his shelter.  Reluctantly,
14   Habana gave petitioner a few days to gather his belongings and move out of the
15   shelter.

16          On January 17, at around 3 p.m., Habana began to move petitioner's
17   belongings out of the shelter.  Petitioner became enraged and threatened to hit
18   Habana.  Petitioner threatened to set Habana's shelter on fire.  Habana testified
19   that he warned petitioner that he would report petitioner to the police if petitioner
20   set Habana's shelter on fire.  About 10 minutes later, petitioner returned with a
21   container, pouring an unidentifiable liquid over a tree next to Habana's shelter.

22          Habana went to call the police and noticed that petitioner was following him
23   close behind.  At this time, Habana ran into Miguel Huerta, and they exchanged a
24   few words before petitioner arrived.  Habana returned to his shelter, and Miguel
25   and petitioner discussed the situation.  Miguel testified that petitioner appeared

26

27   ───────────────
28          [3]The facts set forth are drawn from the California Court of Appeal's decision on direct
     appeal.  (Lodged Doc. 6).  Such factual findings are presumed correct.  28 U.S.C. § 2254(e)(1).

3

very angry and threatened to burn down the shelter.  Miguel warned petitioner not to do anything foolish.  Petitioner insisted he was going to burn down every off-ramp and on-ramp in the area.

Shortly thereafter, petitioner returned to the shelter and exchanged a few heated words with Habana before pulling out a lighter and setting some pine needles on fire near the shelter.  Sue Huerta, who was standing next to them, attempted to put out the fire a couple of times.  The third time, petitioner succeeded in setting a fire, and Sue ran to get more water, but by now, the fire was spreading too fast to put out.  The fire burned an area approximately 50 by 25 feet including Habana's shelter and belongings along with several trees belonging to CalTrans.

### 2.    Arson Investigation

During the trial, Michael Camello, a fire arson investigator with the Los Angeles Fire Department testified that he investigated the fire shortly after firefighters extinguished the fire.  Camello determined that the origin of the fire was in the area of a tree attached to the shelter and caused by an open flame, such as that from a lighter.  A lighter was subsequently recovered from petitioner's pocket after his arrest.

### B.    Defense

Petitioner testified on his own behalf and disputed the facts surrounding the fire.  Petitioner asserted that he took ownership of the shelter after Habana went to jail, and after Habana returned from jail, the ownership of the shelter was never an issue.  Further, petitioner claimed that moments before the start of the fire, he saw people gathered by his shelter smoking cocaine, including Sue, who was using a pan and a candle to heat heroin.  Moments later, as Habana was getting up from a futon near the shelter, petitioner pulled it from under him.  Petitioner suggested the

///

///

4

futon must have hit the pan and started the fire.[4]  Petitioner attempted to put out the fire, but it had quickly spread.  Petitioner went to a nearby fast food restaurant and asked the manager to call 911.  Petitioner denied ever arguing with or threatening Habana and denied that any of the burned property belonged to Habana.

## IV.   STANDARD OF REVIEW

This Court may entertain a petition for writ of habeas corpus on "behalf of a person in custody pursuant to the judgment of a State court only on the ground that he is in custody in violation of the Constitution or laws or treaties of the United States." 28 U.S.C. § 2254(a).  A federal court may not grant an application for writ of habeas corpus on behalf of a person in state custody with respect to any claim that was adjudicated on the merits in state court proceedings unless the adjudication of the claim:  (1) "resulted in a decision that was contrary to, or involved an unreasonable application of, clearly established Federal law, as determined by the Supreme Court of the United States"; or (2) "resulted in a decision that was based on an unreasonable determination of the facts in light of the evidence presented in the State court proceeding." 28 U.S.C. § 2254(d).[5]

In applying the foregoing standards, federal courts look to the last reasoned state court decision.  See Smith v. Hedgpeth, 706 F.3d 1099, 1102 (9th Cir.), cert. denied, 133 S. Ct. 1831 (2013).  "Where there has been one reasoned state judgment rejecting a federal claim, later unexplained orders upholding that

---

[4]On rebuttal, investigator Camello testified that the wax from the candle would not have caused the fire.

[5]When a federal claim has been presented to a state court and the state court has denied relief, it may be presumed that the state court adjudicated the claim on the merits in the absence of any indication or state-law procedural principles to the contrary.  Harrington v. Richter, 562 U.S. 86, 131 S. Ct. 770, 784-85 (2011); see also Johnson v. Williams, 133 S. Ct. 1088, 1094-96 (2013) (extending Richter presumption to situations in which state court opinion addresses some, but not all of defendant's claims).

1  judgment or rejecting the same claim rest upon the same ground."  Ylst v.

2  Nunnemaker, 501 U.S. 797, 803 (1991) (cited with approval in Johnson v.

3  Williams, 133 S. Ct. 1088, 1094 n.1 (2013)); Cannedy v. Adams, 706 F.3d 1148,

4  1158 (9th Cir. 2013) (it remains Ninth Circuit practice to "look through" summary

5  denials of discretionary review to the last reasoned state-court decision – whether

6  those denials are on the merits or denials of discretionary review), as amended on

7  denial of rehearing, 733 F.3d 794 (9th Cir. 2013), cert. denied, 134 S. Ct. 1001

8  (2014).

9        However, to the extent no such reasoned opinion exists, courts must conduct

10  an independent review of the record to determine whether the state court clearly

11  erred in its application of controlling federal law, and consequently, whether the

12  state court's decision was objectively unreasonable.  Delgado v. Lewis, 223 F.3d

13  976, 982 (9th Cir. 2000), abrogated on other grounds, Lockyer v. Andrade, 538

14  U.S. 63, 75-76 (2003); see also Harrington v. Richter, 562 U.S. 86, 131 S. Ct. 770,

15  784 (2011) ("Where a state court's decision is unaccompanied by an explanation,

16  the habeas petitioner's burden still must be met by showing there was no

17  reasonable basis for the state court to deny relief."); Cullen v. Pinholster, 131 S.

18  Ct. 1388, 1402 (2011) ("Section 2254(d) applies even where there has been a

19  summary denial.") (citation omitted).

20  **V.   DISCUSSION**[6]

21        Petitioner claims he is entitled to federal habeas relief because:  (1) as a

22  matter of California law petitioner could only be convicted of a single count of

23  arson (Ground I); (2) the trial court's evidentiary rulings violated petitioner's

24  rights under the Confrontation Clause (Ground II); (3) petitioner's trial counsel

25  rendered ineffective assistance (Ground III); (4) the prosecution engaged in

26

27

28        [6]The Court has read, considered and rejected on the merits all of petitioner's contentions. The Court discusses petitioner's principal contentions herein.

1   misconduct (portion of Ground IV); (5) the trial judge was biased (portion of
2   Ground IV); and (5) cumulative error (Ground V). Petitioner is not entitled to
3   habeas relief on any of his claims.

4          **A.     Petitioner's Challenge to the Propriety of His Two Arson**
5                **Convictions Does Not Merit Federal Habeas Relief**

6          In Ground I, petitioner contends, as a matter of state law and statutory
7   interpretation, that he was improperly convicted of two arson counts under
8   California Penal Code section 451(d) based on a single alleged act of setting a fire,
9   and that the fact that each arson count in this case pertained to property owned by
10  a different entity/person (CalTrans/Habana) does not support two separate
11  convictions. (Petition Memo at 12-14).

12         The California Court of Appeal – the last state court to issue a reasoned
13  decision addressing this claim – rejected the claim on its merits, finding, as a
14  matter of statutory construction and state law, that petitioner could properly be
15  charged with and convicted of two arson counts. (Lodged Doc. 6 at 4-6). The
16  Court of Appeal noted that, as a general matter under California law (subject to an
17  exception not applicable here), a single act or course of conduct by a defendant
18  can lead to convictions of any number of offenses charged, so long as the
19  defendant is not punished for more than one crime arising out of the same act or
20  course of conduct.[7] (Lodged Doc. 6 at 4-5) (citations omitted). It further pointed
21  out that Section 451(d) prohibits an individual from burning property *other than*
22  *his own*, and accordingly, that it was appropriate for the prosecution to charge
23  petitioner with two separate counts of arson arising from a single incident where,
24  as here, petitioner claimed ownership of some of the burned property (the shelter)
25  and its ownership might be disputed. (Lodged Doc. 6 at 6).

26  _____

27         [7]The trial court imposed concurrent terms on the two arson counts. (CT 308-09; RT
    2170-71). Petitioner does not here complain that he was improperly *punished for*, as opposed to
28  improperly *convicted of* the two arson counts.

1    Petitioner is not entitled to federal habeas relief on his instant claim as it is

2    predicated on state law and is not cognizable on federal habeas review.  See

3    28 U.S.C. § 2254(a) (federal habeas corpus relief may be granted "only on the

4    ground that [petitioner] is in custody in violation of the Constitution or laws or

5    treaties of the United States."); Estelle v. McGuire, 502 U.S. 62, 67-68 (1991) (not

6    province of federal habeas court to reexamine state-court determinations on state-

7    law questions; in conducting habeas review, federal court limited to deciding

8    whether conviction violated Constitution, laws, or treaties of United States).  This

9    Court is bound by the state court's reasonable determination under state law that

10   no error occurred.  See Waddington v. Sarausad, 555 U.S. 179, 192 n.5 (2009)

11   ("we have repeatedly held that it is not the province of a federal habeas court to

12   reexamine state-court determinations on state-law questions") (citation and

13   internal quotations omitted); Bradshaw v. Richey, 546 U.S. 74, 76 (2005) (per

14   curiam) ("a state court's interpretation of state law, including one announced on

15   direct appeal of the challenged conviction, binds a federal court sitting in habeas

16   corpus") (citations omitted);  Hicks on behalf of Feiock v. Feiock, 485 U.S. 624,

17   629-30 (1988) ("We are not at liberty to depart from the state appellate court's

18   resolution of these issues of state law.  Although petitioner marshals a number of

19   sources in support of the contention that the state appellate court misapplied state

20   law on these two points, the California Supreme Court denied review of this case,

21   and we are not free in this situation to overturn the state court's conclusions of

22   state law.") (footnote omitted).

23   Accordingly, Ground I does not merit federal habeas relief.

24   **B.    Petitioner's Confrontation Clause Claim Does Not Merit Federal**

25   **Habeas Relief**

26   In Ground II, petitioner asserts that the trial court's rulings in response to

27   prosecution witness Neuman Habana's refusal to answer certain questions on

28   cross-examination violated the Confrontation Clause.  (Petition Memo at 14-22).

8

Specifically, petitioner argues that he should have been allowed to recall and cross-examine Habana regarding the alleged drug activity of others at the homeless camp, and that the trial court erred in denying his repeated motions to strike Habana's testimony or declare a mistrial.  The California Court of Appeal – the last state court to issue a reasoned decision addressing this claim – rejected the claim on its merits, finding that the trial court's limits on petitioner's right to recall Habana did not violate the Constitution.  (Lodged Doc. 6 at 6-10).  Petitioner is not entitled to federal habeas relief on this claim.

### 1.    Additional Pertinent Facts

Neuman Habana testified that on January 17, 2009, he lived in a shelter he built near an off-ramp in an area that had trees, shrubs, and bushes.  (RT 917). When Habana tried to remove petitioner from Habana's shelter, petitioner threatened to set Habana's place on fire.  (RT 947-48).  After two tries, petitioner lit a third fire that spread to burn the shelter and the tree it was built against.  (RT 959-69).  The fire burned the shelter, most of Habana's blankets and clothing, his two chairs, bike parts, and canes, and a plastic trash can, leaving Habana with no belongings.  (RT 969-71; see also RT 1007-08 (Habana admitting the fire burned petitioner's property as well)).[8]

On cross-examination, Habana admitted that he had been arrested for failing to go to a drug program.  (RT 973-74).  Habana admitted to using narcotics (crack cocaine) prior to his arrest, and on a daily basis after he returned to the homeless encampment, and to using a lighter to light the crack that he had in his pocket on the day of the fire.  (RT 974-78, 990; see also RT 1805-06 (defense narcotics expert testifying about how rock cocaine is smoked)).  Habana initially denied that he had used drugs on the day of the fire.  (RT 977; but see RT 991-98, 1010-11,

---

[8]Petitioner testified in his defense that he had thrown all of Habana's personal belongings away while Habana was in jail, that he tore apart and completely rebuilt the shelter, and that the personal items burned were his.  (RT 1823-24, 1848-52).

1015-17, 1025, 1027-30 (Habana admitting that he smoked rock cocaine in his shelter on the day of the fire after he had moved petitioner's things from the shelter and about 10 (or 30 to 45 minutes or more) before the fire and, that in so doing, he used his lighter to light the crack pipe, and that he also smoked after the fire before he spoke to fire investigators); cf. RT 1032-33 (Habana testifying that he smoked after the fire only after he spoke with fire investigators)).[9]   Habana admitted he was high when the fire started and still high when he talked to the police and fire investigator.  (RT 1035).  Habana did not tell the arson investigators that he had smoked rock cocaine shortly before the fire, but did take out his lighter to light a cigarette while the investigators were there.  (RT 1011-13).  Habana was afraid the police would blame him for the fire.  (RT 1031-32).  When asked whether he saw others at the camp using drugs, Habana replied:

> I won't tell you what I saw [sic] what they do.  What I saw is my own, but if it doesn't affect other people, I don't bother them.  If it affects everybody else, especially the houses behind my place or endangers anybody, that is something to say something about.

(RT 978).  Counsel again asked if Habana had seen other people using narcotics and Habana replied:  "That I can't tell you what I saw because it doesn't affect anybody else."  (RT 979).  The court ordered Habana to respond, and Habana replied, "That, I can't give out."  (RT 979).  Out of the jury's presence, petitioner's counsel objected to Habana's refusal to answer questions as impinging on petitioner's right to a fair trial and to confrontation because admitted drug use related to eyewitness credibility and their ability to perceive.  (RT 979-80).  The trial court asked and the prosecution confirmed that the prosecution had other

---

[9]Habana testified that he believed that no matter how much a person used narcotics, a person would not be able to catch his shelter on fire unless the person was "careless enough," and Habana was "not that careless."  (RT 1022).  Habana said no flame Habana lit set the shelter on fire.  (RT 1023).

1   witnesses who could be asked about their drug use.  (RT 979-80).  After some

2   discussion, the court advised that it would order Habana again to answer counsel's

3   questions, and that if Habana refused and that if the defense continued to feel

4   hampered after an opportunity to question the other witnesses whose drug use was

5   in issue, the defense could raise the issue at such later time.  If the other witnesses

6   refused to cooperate, the court would allow the defense to bring Habana back for a

7   hearing.  (RT 982-83).  The court denied petitioner's motion for a mistrial at that

8   time, indicating that if the other witnesses refuse to answer, counsel would have a

9   viable motion at that time.  (RT 983-84).

10       In the presence of the jury, the trial court again ordered Habana to answer

11  the questions asked.  (RT 984).  When asked whether he had seen Sue Huerta

12  consume narcotics in January of 2009, Habana refused to answer.  (RT 984-85).

13  Habana did not know whether Miguel Huerta ever consumed narcotics in January

14  of 2009.  (RT 985).  Habana said he had not consumed rock cocaine with Sue

15  Huerta in January of 2009.  (RT 985).  Habana would not say whether he

16  consumed rock cocaine by himself or with others.  (RT 985-86).  The trial court

17  again ordered Habana to answer the questions posed but to no avail.  (RT 986).

18  After Habana's testimony, the trial court told counsel outside the presence of the

19  jury that the defense would be allowed to ask the defense witnesses about their

20  drug use and ability to perceive.  (RT 1039-40, 1207).  Petitioner's counsel again

21  moved to strike Habana's testimony or alternatively for a mistrial – motions which

22  the trial court denied.  (RT 1207-08).

23       Sue Huerta testified that petitioner lit Habana's hut on fire.  (RT 1226-30).

24  On cross-examination Sue admitted that Habana used his "hut" (or shelter) to

25  smoke rock cocaine.  (RT 1241-42).  She denied ever smoking rock cocaine at all

26  or with Habana before.  (RT 1242, 1264).  She stated that she had stopped using

27  heroin about two weeks before the fire, and was purchasing methadone on the

28  street which she drank daily (including the day of the fire) to help her stay off

heroin. (RT 1243-44, 1264). Sue Huerta said methadone did not give her a high or affect her ability to perceive. (RT 1244, 1258). She shared the methadone she took on the day of the fire with her husband Miguel Huerta, who also consumed methadone daily because he had been a heroin user. (RT 1244-45, 1253). She had seen a person under the influence of rock cocaine and the intoxicated effect. (RT 1246). She did not notice that Habana was under the influence just before the fire. She said Habana would get really quiet under the influence and at that time Habana was boisterous and jumping around. (RT 1246-47). She did not think Habana was using right before the fire. (RT 1246).

Miguel Huerta testified that on the day of the fire petitioner was upset with Habana and told him (Miguel Huerta) that he (petitioner) was going to burn Habana's dwelling. (RT 1272). Miguel Huerta went to a store and when he returned he saw a tree on fire. (RT 1273). He admitted that he was using heroin in January of 2009 on a daily basis and that he, along with Sue Huerta, had used heroin on the morning of the fire. (RT 1274-75).[10] He explained how he prepared heroin for injection by heating it with a lighter which he had with him on the day of the fire. (RT 1274-75; see also RT 1806 (defense narcotics expert explaining how heroin is heated and injected)). He did not tell the fire investigator that he had used heroin that morning or that he had a lighter. (RT 1279). He thought that Habana used crack cocaine but did not see Habana use it on the day of the fire. (RT 1277). He admitted that he and Sue Huerta had used heroin the day before they testified at trial. (RT 1280).

The fire investigator testified that when he investigated the scene he saw that three or four trees and some items had been burned in the area, including what appeared to be a shelter. (RT 1290-95, 1502-06, 1513; see also RT 1560

_____

[10]Petitioner testified that he used drugs with Miguel and Sue Huerta and others at the camp on the day of the fire. (RT 1828-35). Petitioner did drug runs to get cocaine for Miguel and Sue Huerta and others, and Miguel and Sue Huerta would get their own heroin. (RT 1863).

(CalTrans employee testifying that the trees belonged to CalTrans)).  From the
burn patterns, and to some degree from the eyewitness statements, the investigator
concluded that the fire was intentional and began at the tree to which the shelter
was attached.  (RT 1509, 1517-19).  The investigator found no evidence of an
accelerant and admitted that a person using narcotics could accidentally start a
fire.  (RT 1521).  The investigator found a pan with candle wax in it which could
have been a potential source of the fire if it was in the area of origin.  (RT 1524).
The pan however was found 20 to 25 feet from the origin of the fire.  (RT 1524,
1530, 1556).  He opined that a fire from inside the shelter would not be consistent
with the burn patterns because, in his opinion, the fire started outside the shelter
on the right side of the tree.  (RT 1527-28).  The fact that someone had been using
an open flame to heat heroin did not alter the investigator's conclusion that the fire
was intentionally set.  (RT 1529-30).  The investigator could not distinguish
whether the fire was started with a candle or a match or a lighter, only that it was
with an open flame.  (RT 1551).[11]

At the close of the prosecution's case, the trial court found that the Huertas
were not evasive about their own drug use, and had answered the questions
Habana refused to answer.  (RT 1572).  Petitioner's counsel wanted to bring
Habana back to further impeach Sue Huerta's testimony that she and Miguel
Huerta were doing methadone, not heroin.  (RT 1573).  The trial court took under
consideration the matter of whether the defense could recall Habana for the limited
purpose of asking what Habana may know about the Huertas' drug use, but

---

[11]Paul Cohen, the defense narcotics expert who was a former police officer, testified to
the following:  It was not unusual for small fires to be caused by homeless people who are not
careful and drug addicts who are not careful when they cook their food or when they consume
drugs using open flames.  (RT 1807, 1810).  In his experience, people who are using rock
cocaine do not understand or see what is going on around them because users are totally focused
on obtaining rock cocaine, whereas heroin users should be able to follow a conversation if they
are not falling asleep.  (RT 1813-14).  The high from heroin lasts for a period of hours – much
longer than the high from rock cocaine.  (RT 1814-15).

1    indicated there already was sufficient evidence for the impeachment of the Huertas
2    to cast doubt on their credibility.  (RT 1573-75).

3        Petitioner's defense was that it was Sue Huerta's careless heating of heroin
4    that caused the shelter to catch fire.  (RT 1802, 1837-39, 1842-44, 1868-70, 2129-
5    30).  Petitioner denied having words with Habana that day and said he would not
6    have been angry had Habana asked him to leave the shelter.  (RT 1850, 1853-59).
7    Petitioner suggested that Habana and the Huertas were lying so that someone else
8    would take the blame for the fire.  (RT 1875).

9        Petitioner's counsel sought to recall Habana to testify and the trial court
10   denied the final request, finding that the Huertas freely admitted having used
11   drugs, that they had already been adequately impeached, and that recalling Habana
12   to elicit further impeachment evidence would result in an undue consumption of
13   time.  (RT 1880-81).  The court also denied a renewed motion for mistrial noting
14   that the record was "replete with information that impeaches those witnesses."
15   (RT 1881).

16                        **2.    Applicable Law**

17       The Confrontation Clause of the Sixth Amendment, made applicable to the
18   States through the Fourteenth Amendment, provides that "[i]n all criminal
19   prosecutions, the accused shall enjoy the right. . . to be confronted with the
20   witness against him."  U.S. Const. amend. VI; Crawford v. Washington, 541 U.S.
21   36, 42 (2004); Maryland v. Craig, 497 U.S. 836, 844 (1990).  "The central concern
22   of the Confrontation Clause is to ensure the reliability of the evidence against a
23   criminal defendant by subjecting it to rigorous testing in the context of an
24   adversary proceeding before the trier of fact."  Id. at 845.  In other words, the main
25   and essential purpose of confrontation is to secure for the opponent the
26   opportunity of  cross-examination.  See Delaware v. Van Arsdall, 475 U.S. 673,
27   678 (1986) (citations and quotation marks omitted).   However, the Confrontation
28   Clause guarantees only "an *opportunity* for effective cross-examination, not cross-

14

1   examination that is effective in whatever way, and to whatever extent, the defense

2   might wish." Delaware v. Van Arsdall, 475 U.S. at 679 (quoting Delaware v.

3   Fensterer, 474 U.S. 15, 20 (1985) (per curiam) (emphasis in original)).

4   　　　　When a witness gives "testimony that is marred by forgetfulness, confusion,

5   or evasion . . . the Confrontation Clause is generally satisfied when the defense is

6   given a full and fair opportunity to probe and expose these infirmities through

7   cross-examination, thereby calling to the attention of the factfinder the reasons for

8   giving scant weight to the witness' testimony." United States v. Owens, 484 U.S.

9   554, 558 (1988) (quoting Delaware v. Fensterer, 474 U.S. at 21-22); Walters v.

10  McCormick, 122 F.3d 1172, 1175 (9th Cir. 1997) (same), cert. denied, 523 U.S.

11  1060 (1998).[12]  The extent of the cross-examination must be sufficient to allow the

12  jury to evaluate the witness' general credibility and, in particular, the biases and

13  motivations of the witness. Evans v. Lewis, 855 F.2d 631, 633-34 (9th Cir. 1988)

14  (citations omitted).  A trial court may exclude cross-examination "that is repetitive

15  or only marginally relevant." Id. (quoting  Delaware v. Van Arsdall, 475 U.S. at

16  679).  Additionally, as the Court of Appeal noted, a trial court's limitation on

17  cross-examination pertaining to the credibility of a witness does not violate the

18  Confrontation Clause unless a reasonable jury might have received a significantly

19  different impression of the witness' credibility had the excluded cross-examination

20  been permitted.  (Lodged Doc. 6 at 8) (citing, *inter alia*, Delaware v. Van Arsdall,

21  475 U.S. at 680).

22  　　　　A Confrontation Clause claim is subject to harmless error analysis.  See

23  Winzer v. Hall, 494 F.3d 1192, 1201 (9th Cir. 2007) (citing Brecht v.

24  Abrahamson, 507 U.S. 619 (1993)); see also Ocampo v. Vail, 649 F.3d 1098, 1114

25

26  　　　　[12]In Delaware v. Fensterer, the Supreme Court found no Confrontation Clause violation
    where the prosecution's expert witness could not recall the theory on which his opinion was
27  based, but the defense expert was able to suggest to the jury that the prosecution's expert relied
    on a theory which the defense expert considered baseless.  See Delaware v. Fensterer, 474 U.S.
28  at 20 (concluding, "The Confrontation Clause certainly requires no more than this.")

15

1  (9th Cir. 2011) (same), cert. denied, 133 S. Ct. 62 (2012).  "Under this standard,

2  habeas petitioners . . . are not entitled to habeas relief based on trial error unless

3  they can establish that it resulted in 'actual prejudice.'"  Brecht, 507 U.S. at 637.

4  Actual prejudice, in turn, is demonstrated by the petitioner "if the error in question

5  had a 'substantial and injurious effect or influence in determining the jury's

6  verdict.'"  Winzer, 494 F.3d at 1201 (quoting Brecht).  Factors to consider in

7  determining under Brecht whether violation of right to cross-examine was

8  harmless include the importance of the witness' testimony to the prosecution's

9  case, the presence or absence of evidence corroborating or contradicting the

10  testimony of the witness on material points, the extent of cross-examination

11  otherwise permitted, and the overall strength of the prosecution's case.  See

12  Delaware v. Van Arsdall, 475 U.S. at 684.

### 3.    Analysis

14        The Court of Appeal reasonably rejected this claim as the trial court's

15  refusal to allow petitioner to recall Habana to the stand for further examination did

16  not violate the Confrontation Clause.  First, there is no suggestion that Habana's

17  further testimony about Miguel and Sue Huerta's drug use would have given the

18  jury a significantly different impression of the credibility of the Huertas or

19  Habana.  Delaware v. Van Arsdall, 475 U.S. at 680.  Upon cross-examination,

20  Habana freely admitted his own drug use both leading up to and on the day of the

21  fire.  Habana only refused to testify about the drug use of others.  And, as the trial

22  court noted, the prosecution's two other percipient witnesses, Sue and Miguel

23  Huerta, both testified voluntarily about their drug use, and provided petitioner

24  with ample opportunity to impeach their testimony based on inconsistencies

25  between Miguel Huerta's and Sue Huerta's testimony about the drugs they were

26  using, the fact that all percipient witnesses were on drugs during the time the fire

27  took place, and that Miguel and Sue Huerta admittedly used heroin up to the day

28  ///

1    before their testimony at trial.  The Confrontation Clause required no more.

2    <u>Delaware v. Fensterer</u>, 474 U.S. at 20.

3        Assuming, *arguendo*, that petitioner's right to confrontation was violated by

4    the trial court's finding that recalling Habana would be repetitive and unduly time

5    consuming, petitioner can show no prejudice from the trial court's rulings.  The

6    prosecution's case against petitioner was strong.  All three witnesses testified that

7    petitioner had threatened to light the shelter on fire, and the two witnesses who

8    saw the fire lit reported the same story to initial responders and at trial:  petitioner

9    tried three times to light the shelter on fire, Sue Huerta put out the first two fires,

10   and the third fire burned down the shelter and its surroundings, including the trees.

11   The fire investigator testified that he believed the fire was intentionally set in the

12   area where the witnesses said petitioner lit the shelter.

13       The trial court ordered Habana to answer the defense questions and gave the

14   defense wide latitude in cross-examining both Habana and the Huertas so that

15   petitioner could explore his theory of the defense.  The jury heard petitioner's

16   defense that the fire was accidentally started by Sue Huerta's careless drug use at

17   the homeless camp, and heard Habana and Miguel Huerta admit that all three

18   witnesses (Habana, Miguel Huerta, and Sue Huerta) were using drugs involving

19   open flames on the day of the fire.  The jury also heard Habana and Miguel Huerta

20   testify that they did <u>not</u> tell investigators about their drug use on the day of the

21   fire.  Even through trial, Sue Huerta denied her use of heroin on the day of the fire.

22   From this evidence, petitioner had ample support for his contention that the

23   percipient witnesses were motivated to cover up Sue Huerta's alleged drug use just

24   prior to the fire as the cause of the fire.  By their verdict, the jury simply did not

25   believe petitioner's version of the events.

26       On this record, the Court does not find that the trial court's denial of

27   petitioner's request to recall Habana to further impeach the Huertas, and the

28   accompanying defense motion for mistrial, materially violated petitioner's

17

1    constitutional rights.  The Court of Appeal's denial of this claim was not an
2    unreasonable application of clearly established federal law.  See Nevada v.
3    Jackson, 133 S. Ct. 1990, 1994 (2013) (per curiam) ("this Court has never held
4    that the Confrontation Clause entitles a criminal defendant to introduce *extrinsic*
5    *evidence* for impeachment purposes") (emphasis original) (citing, *inter alia*,
6    Jordan v. Warden, Lebanon Correctional Institution, 675 F.3d 586, 596 (6th Cir.
7    2012) ("the Supreme Court has not recognized the sweep of the Confrontation
8    Clause to encompass the right to impeach an adverse witness by putting on a third-
9    party witness") (internal quotations and citation omitted)).  For these reasons,
10   Ground II does not merit federal habeas relief.

11           **C.    Petitioner's Ineffective Assistance of Counsel Claim Does Not**
12                   **Merit Federal Habeas Relief**

13           In Ground III, petitioner asserts a number of reasons his trial counsel
14   assertedly rendered ineffective assistance.  (Petition Memo at 23-26).  Petitioner
15   contends that his trial counsel was ineffective for failing to investigate and
16   subpoena witnesses for the defense, namely Bert Hicks and arson investigator
17   Hernandez.  Petitioner faults counsel for relying on the prosecution to produce
18   witnesses, and for failing to obtain an expert witness to rebut the state's arson
19   expert to support his "not arson" defense.  (Petition Memo at 23, 25-26).
20   Petitioner also faults counsel for failing to research and offer case law to the trial
21   court after the court overruled counsel's objection to the filing of an additional
22   arson count on the day of trial.  Petitioner suggests, without any authority, that
23   counsel should have argued that the additional count put petitioner "twice in
24   jeopardy for the same offense."  (Petition Memo at 24).  Finally, petitioner faults
25   counsel for failing to establish the value of the damaged property in question,
26   since the threshold for felony arson assertedly was $950, and it was estimated that
27   the value of property damaged was $1,000.  (Petition Memo at 24).  As the
28   California Supreme Court rejected such claims without comment on habeas review

18

1   – a determination which is deemed to be on the merits – and as there is no
2   reasoned decision addressing the merits of such claims, this Court has conducted
3   an independent review of the record to assess whether petitioner is entitled federal
4   habeas relief thereon.  Based upon such independent review, this Court concludes
5   that none of these alleged shortcomings establish counsel's ineffectiveness or
6   petitioner's entitlement to federal habeas relief.

### 1.   Applicable Law

8       The Sixth Amendment of the United States Constitution as applied to the
9   states through the Fourteenth Amendment guarantees a state criminal defendant
10  the right to effective assistance of counsel at trial.  Evitts v. Lucey, 469 U.S. 387
11  (1985).  To warrant habeas relief due to ineffective assistance of counsel, a
12  petitioner must demonstrate that:  (1) counsel's performance was deficient; and
13  (2) the deficient performance prejudiced his defense.  Strickland v. Washington,
14  466 U.S. 668, 687-93 (1984).  As both prongs of the Strickland test must be
15  satisfied in order to establish a constitutional violation, failure to satisfy either
16  prong requires that a petitioner's ineffective assistance of counsel claim be denied.
17  Strickland, 466 U.S. at 687, 697 (no need to address deficiency of performance if
18  lack of prejudice is obvious); Hein v. Sullivan, 601 F.3d 897, 918 (9th Cir. 2010)
19  (a court can deny a Strickland claim if either part of the test is not satisfied), cert.
20  denied, 131 S. Ct. 2093 (2011).

### 2.   Pertinent Pretrial Proceedings

22      After the preliminary hearing, petitioner requested and was granted the right
23  to represent himself.  (RT E1-E5).  From May 26, 2009, though May 3, 2010,
24  petitioner represented himself at numerous pretrial hearings while he developed
25  his defense.  (RT D1-N5).  This Court has read and considered the entirety of these
26  hearings and notes that the trial court was accommodating to petitioner's various
27  requests.
28  ///

1   For instance, petitioner was granted an investigator and, upon further
2   request, was granted a different investigator who worked near the crime scene.
3   (RT E5-F1, G4-G5, G8).[13]   Petitioner requested further discovery which was
4   provided to the extent it existed.  See, e.g., RT F3-F7, G2-G3, I5, L10-L11, 1263.
5   Petitioner also requested and was granted appointment of an arson expert.  (RT
6   G5-G6, H1 (court noting concern that the expert might be limited in what could be
7   done since the crime scene may have changed and whatever may have burned may
8   not be preserved), H5).

9   Petitioner wanted to subpoena various witnesses and was instructed to write
10  down the names of the proposed witnesses and to tell the court why petitioner
11  wanted the witnesses to testify.  (RT H7).  After a pause, petitioner asked the court
12  to "hold off" on contacting petitioner's arson expert based on what petitioner's
13  investigator had gathered from the crime scene.  (RT H8-H9).  The court gave
14  petitioner and the prosecution time to discuss the investigator's findings.  (RT
15  H9).  The court approved additional defense investigator hours and petitioner
16  replied, "If we can eliminate the expert witness, I think [the investigator has] been
17  expert enough to help me."  (RT H10).  The court granted petitioner's request.
18  (RT H10).

19  At the next pretrial proceeding, petitioner indicated he had photographs to
20  contest the testimony that the property at issue had an estimated value of $1,000.
21  (RT I3-I4).  The trial court found that the value would be an issue for the trier of
22  fact.  (RT I4).

23  At a later hearing, petitioner advised that he would be calling "at least 15"
24  witnesses he had yet to disclose to the prosecution.  (RT L13).  Petitioner
25  indicated that he would not be ready for trial until he could provide a witness list
26  and advised that he would file a motion to recuse the judge.  (RT L14).  When the

27
28
_____

[13]Petitioner reported that his second investigator had "done an excellent job."  (RT H2).

1   matter returned for the next court date, the judge denied the motion to recuse the

2   judge as untimely since petitioner had been assigned for all purposes to the court

3   for over a year.  (RT M1).   Petitioner then requested that the trial court appoint his

4   standby attorney to represent him during trial because petitioner thought the stress

5   might be too much, but petitioner wanted to complete his investigation before the

6   appointment of standby counsel.  (RT M6-M7).  The trial court permitted

7   petitioner to proceed as requested.  (RT N5).

### 3.   Counsel Was Not Ineffective for Failing to Investigate and Present Witnesses

10   Petitioner fails to demonstrate that his trial counsel was ineffective in failing

11   to investigate and subpoena Bert Hicks and arson investigator Hernandez, who

12   took the photographs of the fire scene,[14] and other unidentified witnesses.

13   Petitioner does not allege how these witnesses may have aided his defense.

14   Petitioner's vague and conclusory allegations do not merit relief.  See James v.

15   Borg, 24 F.3d 20, 26 (9th Cir.) (Strickland claim insufficient where petitioner

16   failed to identify what evidence counsel should have presented which would have

17   aided petitioner), cert. denied, 513 U.S. 935 (1994); see also Jones v. Gomez,

18   66 F.3d 199, 204 (9th Cir. 1995) ("[c]onclusory allegations which are not

19   supported by a statement of specific facts do not warrant habeas relief") (citation

20   omitted), cert. denied, 517 U.S. 1143 (1996); Blackledge v. Allison, 431 U.S. 63,

21   75 n.7 (1977) (summary disposition of habeas petition appropriate where

22   allegations are vague or conclusory; "the petition is expected to state facts that

23   point to a real possibility of constitutional error") (citation and internal quotations

24   omitted).  Moreover, as detailed above, petitioner chose to represent himself

25

26          [14]As to investigator Hernandez, petitioner's counsel inquired whether Hernandez would
27   need to be present to provide a foundation for the photographs and statements taken.  (RT 311-
      12).  The issue was left to the prosecution to lay the proper foundation.  (RT 312).  Hernandez
28   did not testify.

21

through pretrial investigation until the day the case was called for trial.  Petitioner cannot fault counsel for the investigation that petitioner himself chose to undertake or to forego.

There is no indication in the record that petitioner's counsel relied on the prosecution to produce witnesses.  Counsel expressed an intent to call a drug expert and noted that he had two other witnesses to call if he could locate them – for one he had only a first name and the other was a common name.  (RT 314-15).  Later, after voir dire had begun, petitioner provided counsel with a list of 18 named witnesses, some counsel noted were not applicable to the case, and none of those witnesses (who were not included in counsel's list) had been properly subpoenaed.  (RT 602-03).  Petitioner's counsel called his own witnesses in petitioner's defense.  As noted above, petitioner was given many pretrial opportunities to produce a witness list for the court, and had his own investigator while he was representing himself who could have served subpoenas on any witnesses petitioner saw fit to subpoena for trial.  Petitioner also chose to forego obtaining his own arson expert based on what the defense investigator had gathered from the scene.  Once again, petitioner cannot fault counsel for the choices petitioner made in preparing his own case for trial.

In short, the record refutes petitioner's allegations that counsel was ineffective in the foregoing respects.

### 4.    Counsel Was Not Ineffective for Failing to Research and Offer Case Law to Support an Objection to Filing the CalTrans Charge on the Day of Trial

Petitioner faults counsel for failing to research and offer case law to the trial court, after the court overruled counsel's objection on the day of trial to the filing of an additional arson count.  (Petition Memo at 23).

The original Information charged petitioner with one count of arson of a structure in violation of California Penal Code section 451(c).  (CT 95-97).  At the

preliminary hearing, Habana testified that petitioner intentionally lit a tree on fire near Habana's shelter which burned Habana's shelter and all of his belongings inside. (CT 18-23). The prosecution thereafter filed an Amended Information adding an additional count of arson of the property of another (Habana) in violation of California Penal Code section 451(d). (CT 137-40; RT D5). When the matter was called for a hearing on the petitioner's motion to set aside the Information, petitioner's counsel objected to the Amended Information because it named a new victim (Habana) based on information that purportedly was not gathered at the preliminary hearing. (RT D4). Counsel also argued that the evidence was insufficient to support the charges because the shelter was not adequate to be a "structure," and there was a lack of case law to suggest that the shelter was a "structure" (which the court and the prosecution acknowledged). (RT D6-D12). The trial court granted the motion as to the arson of a "structure" count, finding that what was burned did not constitute a "structure," but denied the motion as to arson of the property of Habana since Habana testified that his personal property had been burned. (RT D15).[15]

On the first day of trial, the trial court noted another Amended Information had been filed adding the arson of property of another (CalTrans) count. (RT 301-02). Counsel objected to such Amended Information as untimely, and questioned why there would be multiple counts for the same fire. (RT 302, 305-08). Counsel argued that the issue was whether the charge for arson of property of Habana survived a motion to set aside the Information based on what was burned. (RT 305). The court noted that there was sufficient evidence that a jury could find that petitioner burned the trees which belonged to CalTrans (and could not be

---

[15]The prosecution later amended the Information to delete the section 451(c) count per the trial court's ruling, but to add a second 451(d) count based on the alleged burning of property belonging to CalTrans. (CT 262-65). Petitioner renewed his motion to set aside the Amended Information in later pretrial proceedings – a motion which the court denied. (RT J2-J6).

1  petitioner's property), and any dispute over whether the shelter and items burned
2  belonged to petitioner or to Habana would be a matter for the jury to decide. (RT
3  307). As to whether there could be two counts from the same fire, the court
4  inquired whether counsel had any authority for his argument and counsel then had
5  none given the timing of the amendment. (RT 308). The trial court overruled
6  counsel's objection without prejudice to counsel presenting authority to support
7  his position that two counts could not arise from the single fire. (RT 308-09).

8  As noted in the discussion regarding Ground I herein, the Court of Appeal
9  found that the additional count for the same fire was proper under California law.
10 (Lodged Doc. 6 at 4-6) (noting specifically that "multiple charges and multiple
11 convictions can be based on a single criminal act, if the charges allege separate
12 offenses") (quotations and citation omitted). Counsel cannot be faulted for failing
13 to further pursue a baseless claim. See Rupe v. Wood, 93 F.3d 1434, 1444-45 (9th
14 Cir. 1996) ("[T]he failure to take a futile action can never be deficient
15 performance."), cert. denied, 519 U.S. 1142 (1997).

16            **5.    Counsel Was Not Ineffective for Failing to Establish the**
17                    **Value of the Property Damaged**

18 Petitioner faults counsel for failing to establish the amount of the damage to
19 the property in question. (Petition Memo at 24). At petitioner's behest, counsel
20 took issue with the value of the property that was destroyed, asking for an estimate
21 of the loss amount, and the trial court noted that value was not an element of the
22 charge or any lesser included offenses. (RT 312; see also Cal. Penal Code
23 § 451(d) (containing no threshold amount)). The court found the request
24 irrelevant. (RT 312-13). Once again, counsel cannot be faulted for further
25 pursuing petitioner's baseless claim. See Rupe v. Wood, 93 F.3d at 1444-45.

26            **6.    Conclusion**
27 For all the foregoing reasons, and based on the Court's independent review
28 of the record, Ground III does not merit federal habeas relief.

1
2
### D.     Petitioner's Prosecutorial Misconduct Claim Does Not Merit Federal Habeas Relief

3       Petitioner also raises a number of prosecutorial misconduct allegations.
4  Petitioner contends that the prosecution amended the Information adding the prior
5  strike conviction allegation and the second arson count for destruction of CalTrans
6  property to punish petitioner for rejecting a plea offer and exercising his right to a
7  jury trial.  (Petition Memo at 27-28, 30, 32).  Petitioner also contends that the
8  prosecution improperly vouched for the State's witnesses (Petition Memo at 28,
9  30-31) and knowingly presented false testimony.  (Petition Memo at 31).  As the
10 California Supreme Court rejected such claims without comment on habeas review
11 – a determination which is deemed to be on the merits – and as there is no
12 reasoned decision addressing the merits of such claims, this Court has conducted
13 an independent review of the record to assess whether petitioner is entitled federal
14 habeas relief thereon.  Based upon such independent review, this Court concludes
15 that none of the foregoing allegations amount to misconduct or otherwise merit
16 federal habeas relief.

17
### 1.     Petitioner Has Not Shown That His Prosecution Was Vindictive
18

19      By amending the Information to add the additional count shortly before
20 trial, petitioner asserts the prosecution vindictively prosecuted petitioner for
21 rejecting a plea offer.  (Petition Memo at 27-28, 30, 32 (citing, *inter alia*, United
22 States v. Jenkins, 504 F.3d 694 (9th Cir. 2007); United States v. Lopez, 474 F.3d
23 1208, 1211 (9th Cir. 2007) (a vindictive prosecution claim arises when a
24 prosecutor seeks additional charges solely to punish a defendant for exercising a
25 constitutional right), cert. denied, 550 U.S. 928 (2007), overruled on other
26 grounds, United States v. King, 687 F.3d 1189 (9th Cir. 2012), cert. denied, 134 S.
27 Ct. 1492 (2014)).
28 ///

1         Just before trial, the court noted that petitioner's maximum sentence

2    exposure was 12 years, and that the court previously had offered petitioner time

3    served, with probation and accommodations for transportation to the V.A. office

4    for any medical needs.  (RT 4; see also Petition Memo at 35 (noting that offer

5    came on March 26, 2010 and was declined on April 9, 2010)).  After petitioner

6    declined the offer, the prosecution filed an Amended Information alleging that

7    petitioner had a prior strike conviction and another adding the CalTrans arson

8    count.  (RT 5-6; see also CT 257-59, 262-65 (Amended Informations filed on May

9    21 and June 3, 2010)).  Petitioner noted on the record that he had talked with his

10   attorney at the time of the offer, and that the prosecution had threatened petitioner

11   with two counts and another five years.  (RT 4-5).  The court concluded that it did

12   not have authority to strike a five year prior conviction, and the case was not

13   resolved through plea negotiations.  (RT 5-6).

14        "For an agent of the State to pursue a course of action whose objective is to

15   penalize a person's reliance on his [or her] protected statutory or constitutional

16   rights is 'patently unconstitutional.'"  United States v. Goodwin, 457 U.S. 368,

17   372 n.4 (1982) (quoting Bordenkircher v. Hayes, 434 U.S. 357, 363 (1978)).

18   Where the action is adding additional charges, the defendant "must show

19   vindictiveness on the part of those who made the charging decision."  United

20   States v. Edmonds, 103 F.3d 822, 826 (9th Cir. 1996) (citations and internal

21   quotations omitted).

22        To establish a prima facie case of prosecutorial vindictiveness, a

23        defendant must show either direct evidence of actual vindictiveness

24        or facts that warrant an appearance of such.  Evidence indicating a

25        realistic or reasonable likelihood of vindictiveness may give rise to a

26        presumption of vindictiveness on the government's part.

27   United States v. Montoya, 45 F.3d 1286, 1299 (9th Cir.) (internal citations and

28   quotations omitted), cert. denied, 516 U.S. 814 (1995).  In the absence of proof of

actual vindictiveness, petitioner must prove an improper prosecutorial motive through objective evidence before any presumption of vindictiveness attaches. <u>Id.</u> at 1299 (citation omitted).  "[T]he appearance of vindictiveness results only where, as a practical matter, there is a realistic or reasonable likelihood of prosecutorial conduct that would not have occurred but for hostility or a punitive animus towards the defendant because he has exercised his specific legal rights." <u>United States v. Gallegos-Curiel</u>, 681 F.2d 1164, 1169 (9th Cir. 1982) (citing <u>Goodwin</u>, 457 U.S. at 372-73).  Here, the record does not contain evidence of actual vindictiveness.  Rather, petitioner contends the filing of the additional allegation following petitioner's rejection of the plea bargain creates a presumption of vindictiveness.[16]  A presumption of vindictiveness has not been shown.

"The mere adding of the new charge at that [pretrial] stage of the proceedings did not give rise to an appearance of vindictiveness." <u>United States v. McCoy</u>, 495 Fed. Appx. 774, 775 (9th Cir. 2012), <u>cert. denied</u>, 133 S. Ct. 898 (2013); <u>see also</u> <u>United States v. Kent</u>, 649 F.3d 906, 913-14 (9th Cir.) (prosecutor may file enhanced charges when a defendant refuses to cooperate, even when the

_____

[16]The United States Supreme Court has held that a presumption of vindictiveness arises when, *following a conviction*, a defendant's exercise of a procedural right causes or threatens a second trial, and the defendant then is exposed to even greater punishment.  <u>See</u> <u>Blackledge v. Perry</u>, 417 U.S. 21 (1974); <u>North Carolina v. Pearce</u>, 395 U.S. 711 (1969).  However, "[t]he Supreme Court has 'generally rejected the presumption of prosecutorial vindictiveness in the pretrial context.'"  <u>United States v. Vallo</u>, 238 F.3d 1242, 1249 (10th Cir.) (citations omitted), <u>cert. denied</u>, 532 U.S. 1057 (2001); <u>see also</u> <u>Nunes v. Ramirez-Palmer</u>, 485 F.3d 432, 442 (9th Cir. 2007) (argument that presumption of prosecutorial vindictiveness in pretrial charging decision is not clearly established federal law under 28 U.S.C. section 2254(d)), <u>cert. denied</u>, 552 U.S. 962 (2007).  To the contrary, in <u>Goodwin</u>, the Supreme Court held that no presumption of vindictiveness attends a prosecutor's decision to charge a felony arising out of the same incident that was the subject of a previously charged misdemeanor to which the defendant had refused to plead guilty.  <u>Goodwin</u>, 457 U.S. at 381-83; <u>see also</u> <u>United States v. Gallegos-Curiel</u>, 681 F.2d at 1167 ("When there is no evidence of actual vindictiveness and the only question is whether it must be presumed, cases involving increased charges or punishments after trial are to be sharply distinguished from cases in which the prosecution increases charges in the course of pretrial proceedings.").

1   defendant wants to plead guilty to the original charges;  "As a general matter,
2   prosecutors may charge and negotiate as they wish. . . .  As a matter of law, the
3   filing of additional charges to make good on a plea bargaining threat. . . will not
4   establish the requisite punitive motive []."), <u>cert. denied</u>, 132 S. Ct. 355 (2011);
5   <u>United States v. Gamez-Orduño</u>, 235 F.3d 453, 462 (9th Cir. 2000) ("[I]n the
6   context of pretrial plea negotiations vindictiveness will not be presumed simply
7   from the fact that a more severe charge followed on, or even resulted from, the
8   defendant's exercise of a right."); <u>United States v. Noushfar</u>, 78 F.3d 1442, 1446
9   (9th Cir. 1996) (even during plea negotiations, "prosecutors may threaten
10  additional charges and carry through on this threat.  This action alone does not
11  violate a defendant's due process rights, nor does it create a presumption of
12  vindictiveness.") (citations omitted).  Here, while the additional prior strike
13  conviction allegation and the CalTrans arson count were added just before trial,
14  after petitioner rejected a plea offer, there is no suggestion the addition was
15  improper or vindictive.

16      Based on this Court's independent review of this claim, the California
17  Supreme Court's rejection of this claim was not contrary to, or an unreasonable
18  application of, any clearly established federal law as determined by the United
19  States Supreme Court.  <u>See</u> 28 U.S.C. § 2254(d).  Accordingly, petitioner is not
20  entitled to habeas relief on this portion of Ground IV of the Petition.

21              **2.      The Prosecution Did Not Improperly Vouch for the State's**
22                       **Witnesses**

23      Petitioner also contends that the prosecution improperly vouched for the
24  "condition and state of mind" of the prosecution witnesses, all the while knowing
25  that the witnesses were under the influence of drugs when they came to court,
26  prejudicing petitioner since the case hinged on witness credibility.  (Petition
27  Memo at 28, 30-31).  Petitioner does not indicate any place in the record where the
28  prosecution vouched for these witnesses other than a general reference the

28

1  prosecutor purportedly offering her personal opinion during closing argument.

2  (Petition Memo at 28, 30-31).

3       There is no suggestion that the prosecution vouched in any way for the state

4  of mind of the State's witnesses.  The jury was presented with evidence that the

5  Huertas had taken heroin close in time to their testimony.[17]   In closing, the

6  prosecutor explained (without objection) the physical evidence and why it

7  supported a finding that the prosecution witnesses were telling the truth and

8  petitioner was not.  See RT 2119, 2125-28, 2145 (closing).

9       "Vouching consists of placing the prestige of the government behind a

10  witness through personal assurances of the witness's veracity, or suggesting that

11  information not presented to the jury supports the witness's testimony."  United

12  States v. Weatherspoon, 410 F.3d 1142, 1146 (9th Cir. 2005) (internal citation

13  omitted).  The prosecution's comments, based on the evidence adduced at trial, do

14  not rise to the level of vouching.  The prosecutor did not offer her personal

15  assurances that her witnesses were telling the truth or suggest any evidence

16  outside the record supported their testimony.  A prosecutor has "reasonable

17  latitude" in fashioning closing arguments and can argue "reasonable inferences"

18  from the evidence, as here, "including that one of two sides is lying."  Id.

19  (quotations and citation omitted).  On this record, the prosecutor did not

20  improperly vouch for her witnesses.[18]

21

22      [17]As summarized above, Miguel Huerta admitted on cross-examination that he and Sue

23  Huerta had taken heroin the day before they testified at trial.  The jury had this information and
could evaluate witness credibility.

24
    [18]Additionally, the Court finds no prejudice from the prosecution's argument given the

25  trial court's instructions to the jury that:  "[Y]ou must decide what the facts are in this case.  You

26  must use only the evidence that was presented in this courtroom. . . .  Nothing the attorneys say is
evidence.  In their opening statements and closing arguments, the attorneys discuss the case, but

27  their remarks are not evidence."  (RT 2108).  Compare Duckett v. Godinez, 67 F.3d 734, 743

28  (9th Cir. 1995) (assuming prosecutor's comment was improper, no constitutional violation based

(continued...)

1
2

### 3.    There Is No Evidence the Prosecution Knowingly Presented False Testimony

3    Petitioner contends that the prosecution knowingly presented false
4    testimony.  (Petition Memo at 31) (citing <u>Napue v. Illinois</u>, 360 U.S. 264, 269
5    (1959) (a prosecutor's knowing use of perjured testimony to obtain a conviction
6    violates due process)).  To succeed on a <u>Napue</u> claim, a defendant "must show that
7    (1) the testimony (or evidence) [presented by the prosecution] was actually false,
8    (2) the prosecution knew or should have known that the testimony was actually
9    false, and (3) the false testimony was material."  <u>Hayes v. Ayers</u>, 632 F.3d 500,
10    520 (9th Cir. 2011) (citation omitted); <u>Jackson v. Brown</u>, 513 F.3d 1057, 1071-72
11    (9th Cir. 2008) (same).  Here, petitioner has made nothing more than general
12    allegations.  There is no indication in the record that the prosecution knowingly
13    presented false testimony.  The prosecution simply presented the State's theory of
14    the case contrary to petitioner's defense.  This is not misconduct.  <u>See</u> <u>United</u>
15    <u>States v. Aichele</u>, 941 F.2d 761, 766 (9th Cir. 1991) (rejecting prosecutorial
16    misconduct claim where contention that testimony was perjured was "mere
17    speculation.").[19]

18    ### 4.    Conclusion

19    For these reasons, and based on the Court's independent review of the
20    record, petitioner's prosecutorial misconduct claim does not merit federal habeas
21    relief.

22    ────────────────────

23    [18](...continued)
24    on isolated moment in lengthy trial were jury was instructed that the statements of attorneys are not evidence), <u>cert. denied</u>, 517 U.S. 1158 (1996).  The jury is presumed to have followed the
25    trial court's instructions.  <u>See</u> <u>Weeks v. Angelone</u>, 528 U.S. 225, 234 (2000).

26    [19]Petitioner also contends that the prosecution only provided black and white photographs
27    in discovery (Petition Memo at 32), but admits later that he was provided with color photographs as indicated on record.  <u>See</u> Petition Memo at 32; RT I-5 (prosecutor indicating that petitioner
28    was given copies of photographs).

1
2

### E.     Petitioner's Judicial Bias Claim Does Not Merit Federal Habeas Relief

3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19

Petitioner contends that his trial judge was biased for (1) allowing the prosecution to present witnesses who were under the influence of drugs; (2) "swaying" Habana to answer defense questions with "I don't know," to avoid having to order Habana to answer, and otherwise for not holding Habana in contempt for his refusal to answer the defense questions about the drug use of others; and (3) failing to address petitioner's bias claims in detail when petitioner filed his motion to recuse the judge.  (Petition Memo at 35-37; see also CT 247-52 (petitioner's motion raising issue with many pretrial rulings)).  Petitioner also generally alleges that the trial court's "blind view" to the prosecution's alleged misconduct assisted the prosecution's efforts in prejudicing petitioner.  (Petition Memo at 28).  As the California Supreme Court rejected such claims without comment on habeas review – a determination which is deemed to be on the merits – and as there is no reasoned decision addressing the merits of such claims, this Court has conducted an independent review of the record to assess whether petitioner is entitled federal habeas relief thereon.  Based upon such independent review, this Court concludes that none of the foregoing allegations demonstrate judicial bias or otherwise merit federal habeas relief.

20
21
22
23
24
25
26
27
28

"[T]he Due Process Clause clearly requires a 'fair trial in a fair tribunal,' before a judge with no actual bias against the defendant or interest in the outcome of his particular case."  Bracy v. Gramley, 520 U.S. 899, 904-05 (1997) (citation omitted); In re Murchison, 349 U.S. 133, 136 (1955); see also Ungar v. Sarafite, 376 U.S. 575, 584 (1964) (petitioner has a "right to be tried by an unbiased and impartial judge without a direct personal interest in the outcome of the hearing.").  "There is a strong presumption that a judge is not biased or prejudiced[.]"  Rhoades v. Henry, 598 F.3d 511, 519 (9th Cir. 2010); see also Larson v. Palmateer, 515 F.3d 1057, 1067 (9th Cir.) ("petitioner must overcome a

presumption of honesty and integrity in those serving as adjudicators") (citation omitted), cert. denied, 555 U.S. 871 (2008). Petitioner has failed to rebut that presumption here.

As explained above, petitioner has not shown any prosecutorial misconduct. Petitioner's bias claim predicated on the trial court's "blind view" to the prosecution's presentation of its case does not show bias. Nor does petitioner's claim predicated on the trial court allowing the prosecution to present witnesses who allegedly were under the influence show bias. To the extent any of the prosecution witnesses may have been using drugs, the jury was informed of such and could use the same in determining the weight to be given to the witness testimony. From the record it appears that the witnesses were able to coherently and directly answer the questions posed to them – and did so with no objection or question as to their competence.

To the extent petitioner claims that the trial court was required under California law to make a more detailed ruling on his motion to recuse the trial judge, petitioner fails to state a federal claim. See Waddington v. Sarausad, 555 U.S. at 192 n.5; see also Swarthout v. Cooke, 131 S. Ct. 859, 863 (2011) (noting that the Supreme Court "long recognized that a mere error of state law is not a denial of due process") (citations omitted). Additionally, judicial rulings alone – which were the basis of the recusal motion – "almost never constitute a valid basis for a bias or partiality motion." Liteky v. United States, 510 U.S. 540, 555 (1994). "A judge's ordinary efforts at courtroom administration – even a stern or short-tempered judge's ordinary efforts at courtroom administration – remain immune [from a bias challenge]." Id. at 556.

Based upon its independent review of the entire trial proceedings, this Court discerns no indication that the trial judge was biased against petitioner in any way. The trial judge patiently allowed petitioner time to develop his case as petitioner represented himself and, when petitioner chose to have counsel during trial,

32

1   presided over the trial with no indication of bias.  This claim is without merit and

2   accordingly fails to establish petitioner's entitlement to federal habeas relief.[20]

3       **F.    Petitioner's Cumulative Error Claim Does Not Merit Federal**

4           **Habeas Relief**

5       Petitioner contends that the cumulative effect of the foregoing alleged errors

6   denied him due process.  (Petition Memo at 37-40).  As the California Supreme

7   Court rejected such claim without comment on habeas review – a determination

8   which is deemed to be on the merits – and as there is no reasoned decision

9   addressing the merits of such claims, this Court has conducted an independent

10  review of the record to assess whether petitioner is entitled federal habeas relief

11  thereon.  Based upon such independent review, this Court concludes that

12  petitioner is not entitled to habeas relief on this claim.

13      As discussed above, this Court has considered and rejected all of the

14  foregoing claims on the merits.  "While the combined effect of multiple errors may

15  violate due process even when no single error amounts to a constitutional violation

16  or requires reversal, habeas relief is warranted only where the errors infect a trial

17  with unfairness."  Payton v. Cullen, 658 F.3d 890, 896-97 (9th Cir. 2011), cert.

18  denied, 133 S. Ct. 426 (2012).  Habeas relief on a theory of cumulative error is

19  appropriate when there is a "'unique symmetry' of otherwise harmless errors, such

20  that they amplify each other in relation to a key contested issue in the case."

21  Ybarra v. McDaniel, 656 F.3d 984, 1001 (9th Cir. 2011), cert. denied, 133 S. Ct.

22  424 (2012) (citation omitted).  Here, no such symmetry of otherwise harmless

23  errors exists.  The claimed errors either were not errors or were not prejudicial, or

24  both.  Petitioner's claim of cumulative error is meritless and accordingly, does not

25  entitle petitioner to federal habeas relief.

26  ///

27  _____

28      [20]Petitioner alleges that the trial judge improperly determined petitioner was not suitable for a wheel chair, but admits the issue was later resolved.  (Petition Memo at 34-35).

1  **VI.    CONCLUSION**

2          IT IS THEREFORE ORDERED that:  (1) the Petition is denied and this

3  action is dismissed with prejudice; and (2) the Clerk shall enter judgment

4  accordingly.

5          IT IS SO ORDERED.

6  DATED:      December 29, 2014

7

8                                    _____/s/_____

9                                    Honorable Jacqueline Chooljian
                                     UNITED STATES MAGISTRATE JUDGE
10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

34